PETROLEUM SALES, LTD. and Willner's Fuel Distributors, Inc., Appellants,

v.

MAPCO ALASKA, INC., d/b/a North Pole Refinery, Formerly Known As Earth Resources Company of Alaska, Inc., Appellee.

No. 7875.

Supreme Court of Alaska.

Aug. 17, 1984.

Lloyd I. Hoppner, Rice, Hoppner, Brown & Brunner, Fairbanks and Wallace M. Rudolph, Tacoma, Wash., for appellants.

Hal R. Horton, Carol A. Johnson and Philip Blumstein, Birch, Horton, Bittner, Pestinger & Anderson, Anchorage, Richard Haas and Terry Michael Gordon, Lasky, Haas, Cohler & Munter, San Francisco, Cal., Randolph L. Jones, Jr., Tulsa, Okl., for appellee.

Before BURKE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MOORE, Justice.

This appeal involves an antitrust action by appellants Petroleum Sales, Ltd. (hereinafter "Petroleum Sales") and Willner's Fuel Distributors, Inc. (hereinafter "Willner") against Mapco Alaska, Inc. (hereinafter "Mapco"), the sole oil refinery in the Interior of Alaska, for monopoly pricing.

The primary issue presented on appeal is whether the trial court erred in granting summary judgment in favor of Mapco on the basis that the terms of the settlement release in a prior antitrust action between the same parties bar the instant action. In essence, we are required to determine whether appellants presently allege unlawful acts sufficiently dissimilar from those encompassed in the previous settlement release which give rise to a new actionable claim.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The availability of North Slope crude oil via the Trans-Alaska Pipeline System prompted the construction of an oil refinery in 1977 at North Pole, Alaska by Earth Resources of Alaska, Inc., now Mapco. Although a relatively small refinery, it was designed to supply middle distillates,[1] such as home heating oil, to the Interior of Alaska. Mapco's ultimate goal, as the only Interior refinery, was to supply 100% of the Interior market with its products. Prior to its entrance into the market, major national marketers such as Chevron USA, Inc., Union Oil Co. of California and Texaco, Inc. imported their refined products into the Interior. Tesoro Alaska Petroleum Co. also serviced the Interior from its Kenai refinery and was recognized by Mapco as its prime competitor in supplying refined products.

When the refinery began operating in September 1977, Mapco did not possess a distribution network, storage facility or transportation capacity. Mapco's initial marketing strategy was to utilize existing channels of distribution in order to maximize offtake from its fledgling refinery as quickly as possible.[2] It negotiated con-

---

1. Middle distillates include refinery products in the middle of the distillation range of crude oil, including kerosene, kerosene-based jet fuel, home heating fuel, range oil, stove oil and diesel fuel. 8 Williams and Meyers, Oil and Gas Law, at 426–27 (1981).

2. Entering into direct sales relationships with smaller fuel distributors (jobbers) would eventually improve Mapco's long-term competitiveness with imported fuel; however, at the outset, Mapco would lose the immediate sales to the major marketers who traditionally supplied the jobbers. Many jobbers would remain loyal to

tracts to sell its products primarily to the existent major wholesale distributors who sell to smaller distributors or "jobbers" who, in turn, sell to ultimate consumers.

Appellant Petroleum Sales was a jobber supplied by major marketer Union. Appellant Willner, although originally a Texaco jobber, later purchased directly from Mapco.

After considerable negotiation, all major marketers except Tesoro and Shell Oil Co. contracted with Mapco for a projected minimum [3] and maximum gallonage per month. Mapco offered its products at a floating price in parity with Anchorage and other west coast terminals. Initially, discounts of up to four cents per gallon were also offered to these major marketers, in line with leading marketer discounts to their heating fuel jobbers in the Interior market. Discounts were an attempt to bring Mapco prices in line with those available in Anchorage to major marketers, and often included a transportation differential. Various discounts were also offered to other classes of trade such as government, utilities and major industry.

As early as 1977, several jobbers had expressed an interest in buying directly from Mapco, including appellant Willner. Mapco's refinery opened in September 1977.

By June 28, 1978, less than one year after the startup of its refinery, Mapco was supplying 90% of the home heat and diesel fuel requirements of the Interior of Alaska, selling primarily via the major marketers.

In November 1978 Mapco first offered a discount (of approximately one cent per gallon) to all jobbers in order to move excess inventory and also to provide an incentive to new jobbers to capture volumes then unserved and impact imported volumes.[4] Union Oil Co. reacted to this news with a demand that it, too, should be offered the supplemental discount now offered directly to jobbers.

Appellant Willner, a former Texaco jobber, probably tripled its offtake from Mapco as a result of the discount. When Texaco withdrew from the market as an intermediary, Willner's sales options apparently increased.

In January 1979 the jobber discount became a permanent fixture in Mapco's pricing structure. At about this time, the discount to major marketers was decreased from four cents to 3.5 cents per gallon as a business decision. Primarily, the transportation differential was eliminated, an apparent reflection of the fact that Fairbanks pricing was still lower than other U.S. locations, including Anchorage, depending upon the supplier.

In May 1979 appellants and two other local fuel distributors filed an antitrust action against Mapco's predecessor [5]—*76 Aviation Services, Inc., et al. v. Earth Resources of Alaska, Inc.*, No. 4FA–79–902, (hereinafter *"76 Aviation"*). The second amended complaint alleged causes of action pursuant to AS 45.52.010–.030 [6] for damages sustained in their business by the elimination of competition.

The complaint alleged that with intent to monopolize the Interior market, Mapco initiated horizontal agreements with existing major marketers not to compete. It also alleged that Mapco targeted competitor Tesoro Oil Co. and its jobbers for elimination

their marketer until and unless substantial cost savings were offered by Mapco.

3. Mapco retained the option to invoice for volumes not purchased below the revised minimums specified by the buyer, *if* and only if the buyer purchased from another source before fulfilling the commitment specified in the contract.

4. Apparently, Tesoro earlier in April, 1977 had also cut its contract prices on middle distillates in order to move more of its product.

5. In December 1980 Mapco acquired substantially all of the issued and outstanding shares of common stock of Earth Resources Company pursuant to a tender offer made in November 1980. Mapco, appellee herein, is a subsidiary of Earth Resources Company and was formerly known as Earth Resources of Alaska, Inc. North Pole Refinery is a division of Mapco.

6. Currently numbered as AS 45.50.562–.566.

by offering discounted prices to unbranded jobbers in exchange for agreements to purchase exclusively from Mapco.

The complaint further alleged that defendant Earth Resources had been successful at that point because it already supplied substantially 100% of all middle distillates in the Interior of Alaska.

In short, the complaint alleged that Mapco had unlawfully conspired and attempted to monopolize and had, in fact, achieved an unlawful monopoly of the Interior market, primarily by means of its unlawful discounting schemes. Appellants sought both injunctive relief and damages in excess of five million dollars.

In response to Mapco's motion for partial summary judgment, appellants also later claimed that they were injured due to the higher price which resulted from Mapco's monopoly scheme.

The case settled before trial in October 1980 and all parties were signatories to a "Settlement Agreement, Release of Claims and Covenant Not to Sue." Mapco's predecessor paid the plaintiffs (including the two present appellants) a substantial sum of money and agreed to withdraw its petition for review of the dismissal of its counterclaim.

Both sides expressly released the other "from any and all claims, equitable and legal, known or unknown, which they pres-

ently have ... and each covenant not to sue [the other] based on any such claims existing as of this date." [7]

Both sides also "covenant[ed] not to use, directly or indirectly, any of the information generated during the pendency of Case No. 4FA–79–902 [*76 Aviation*] in connection with any legal ... action or proceeding; or for any other purpose whatsoever."

As part of the settlement, the parties signed a stipulation and proposed order of dismissal with prejudice encompassing all claims and counterclaims. A judgment of dismissal with prejudice was entered on October 27, 1980.

On February 16, 1982 appellants Petroleum Sales and Willner, as well as two local distributors who were not parties to the prior action, filed the instant antitrust action against Mapco alleging violations of the same antitrust statutory provisions, AS 45.50.562–.566. The instant complaint, like that of *76 Aviation*, was prepared by the same law firm and again alleges anticompetitive horizontal agreements between the same parties and the attainment of an unlawful monopoly. Unlike *76 Aviation*, unlawful price discounting was not specifically mentioned. Appellants now complain that subsequent unlawful exploitation of that monopoly by unwarranted price increases has damaged them. No injunctive relief was sought; only treble damages pursuant to AS 45.50.576.[8]

7. The release provides, in pertinent part:
   Plaintiffs, their principals, officers, and attorneys, and related companies, specifically including Interior Leasing Company, Inc., Union Products, Inc., 76 Aviation Services, Inc., Star Energy Corp., and Tanana Valley Refining Company, expressly release all Defendants, and their officers, directors, agents and employees from any and all claims, equitable and legal, known or unknown, which they presently have, and each covenants not to sue Defendants based on any such claims existing as of this date. Defendants and their officers and directors expressly release all Plaintiffs, together with their principals, attorneys, and officers, from any and all claims, equitable or legal, known or unknown, which they presently have, excepting Plaintiffs [sic] obligations to Defendants for trade debts, and Defendants covenant not to sue Plaintiffs based on any such claims existing as of this date.

The parties to this agreement, together with their officers, directors, employees, agents and attorneys, covenant not to use, directly or indirectly, any of the information generated during the pendency of Case No. 4FA–79–902 in connection with any legal, regulatory, administrative, commercial or other action or proceeding; or for any other purpose whatsoever.

8. AS 45.50.576 provides, in pertinent part:
   Suits by persons injured. (a) A person who is injured in his business or property by a violation of AS 45.50.562–45.50.570, or a person so injured because he refuses to accede to a proposal for an arrangement which, if consummated, would be a violation of AS 45.50.-562–45.50.570, may bring a civil action (1) for damages sustained by him, and if the judgment is for the plaintiff and the trier of fact finds that the defendant's conduct was

Mapco counterclaimed for breach of the settlement agreements and requested specific performance of the same. In June 1982 Mapco filed a motion to dismiss or, in the alternative, for summary judgment against appellants on the grounds that the action was barred because of the *76 Aviation* settlement release and *res judicata.*[9]

On March 7, 1983 Judge Van Hoomissen issued a memorandum opinion and an order in which he granted Mapco's summary judgment motion and dismissed appellants from the action.

The trial court was unable to discern "any new acts ... since execution of the release which would give rise to a new cause of action, as opposed to one barred by settlement of the prior lawsuit."

This appeal followed.

## II. DOES AN INCREASE IN PRICES, SUBSEQUENT TO THE EXECUTION OF A SETTLEMENT RELEASE OF ALL CLAIMS OF UNLAWFUL MONOPOLISTIC ACTIVITIES, CONSTITUTE AN UNLAWFUL ACT WHICH GIVES RISE TO A NEW ACTIONABLE CLAIM?

■ The issue before us in this appeal poses the question of whether appellants have asserted a claim sufficiently distinct from those which they voluntarily relinquished in settlement of a prior antitrust action against appellee Mapco.

In the prior action, *76 Aviation,* appellants complained of injury to their business caused by Mapco's predecessor's alleged violations of AS 45.52.010–.030.[10] In essence, the complaint alleged that by means of predatory discounting schemes and horizontal agreements with existing marketers, Mapco conspired and attempted to monopolize and did, in fact, achieve a monopoly of the Interior market for middle fuel distillates. At that time, appellants specifically alleged that Mapco was already supplying substantially 100% of the market.

The case was dismissed with prejudice pursuant to a settlement agreement in which both parties expressly released the other from any and all claims, known or unknown, which they then had and covenanted not to sue the other based on any such claims existing as of that date. Further, both parties agreed not to use any of the information generated in the case for any purpose whatsoever.

Now appellants argue that the dismissal below of the instant action pursuant to the terms of that release was error because the conduct presently complained of is not underpricing, as in the prior action, but overpricing. We disagree.

---

wilful, the plaintiff shall be awarded threefold the amount of damages sustained by him, plus the costs of the suit, including reasonable attorney fees; and

(2) to enjoin the unlawful practice, and if judgment is for the plaintiff, he may be awarded the costs of the suit, including reasonable attorney fees.

**9.** A similar motion was filed by Mapco against appellants' companion plaintiffs (who were not parties to the release in the prior action) on different grounds; however, it was denied.

**10.** Currently numbered as AS 45.50.562–.566, the statutes provide:

Sec. 45.50.562. Combinations in restraint of trade unlawful. Every contract, combination in the form of trust or otherwise or conspiracy, in restraint of trade or commerce is unlawful.

Sec. 45.50.564. Monopolies and attempted monopolies unlawful. It is unlawful for a person to monopolize, or attempt to monopolize, or combine or conspire with another person to monopolize any part of trade or commerce.

Sec. 45.50.566. Transactions and agreements not to use or deal in commodities or services unlawful. It is unlawful for a person to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, or services, whether patented or unpatented, for use, consumption, enjoyment, or resale, or fix a price charged for it, or discount from, or rebate upon, that price, on the condition, agreement, or understanding that the lessee or purchaser will not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodity or service of a competitor or competitors of the lessor or seller, if the effect of the lease, sale or contract for sale, or of the condition, agreement, or understanding may be substantially to lessen competition or tend to create a monopoly in any line of commerce.

Appellants' complaint in the instant case substantially echoes that in the prior case. Both allege, *inter alia*, that the same anti-competitive horizontal agreements between Mapco and the major marketers contributed to the achievement of a monopoly. The settlement release clearly precludes the use of information pertaining to these allegations and the litigation of them.

The only new conduct complained of subsequent to the release are price increases in alleged exploitation of the monopolistic position already obtained.

AS 45.50.562–.566 do not prohibit the setting of high prices. AS 45.50.562 prohibits contracts or combinations in restraint of trade. AS 45.50.564 prohibits monopolization or attempts to monopolize or combinations or conspiracies to monopolize. AS 45.50.566 prohibits transactions or agreements not to use or deal in commodities or services of a competitor of the seller or lessor, if the effect may be to substantially lessen competition or tend to create a monopoly. Specifically mentioned are price fixing and price discounting, the latter of which was the gravamen of appellants' complaint in *76 Aviation*.

Appellants fail to provide any authority for the proposition that monopoly pricing alone is actionable anticompetitive behavior. On the contrary, we agree with the proposition that high prices generally tend to encourage competitive entry into the market.

> But unless the monopoly has bolstered its power by wrongful actions, it will not be required to pay damages merely because its prices may later be found excessive. Setting a high price may be a use of monopoly power, but it is not in itself anticompetitive. Indeed, although a monopolist may be expected to charge a somewhat higher price than would prevail in a competitive market, there is probably no better way for it to guarantee that its dominance will be challenged than by greedily extracting the highest price it can.

*Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 294 (2d Cir.1978) *cert.*

*denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980) (citations omitted).

> Charging a monopoly price and earning monopoly profits is in no way anticompetitive. To the contrary, it can provide the competitive incentive that keeps an economy dynamic and innovative.

*In re IBM Peripheral EDP Devices, Etc.*, 481 F.Supp. 965, 990 (N.D.Cal.1979).

Moreover, a claim based solely upon the setting of higher prices would be barred by the release in the prior case.

First, we cannot fail to note that appellants, contrary to their present position, did contemplate higher prices in *76 Aviation*. Although not stated in their complaint in that prior action, in their Memorandum in Response to Defendant's Motion for Partial Summary Judgment, appellants claimed that "[t]hey [were] all injured as a result of the ... higher prices that they [were] required to pay ... for [defendant's] product" and that "[t]he higher price [was] the proximate result of the monopoly scheme of North Pole Refinery."

Second, even were we to ignore that admission, we are of the opinion that unlawful monopolistic pricing encompasses both underpricing and overpricing. Further, higher prices are generally the natural, foreseeable outcome of the attainment of a monopolistic position in the market by means of predatory underpricing.

Appellants pleaded in the *76 Aviation* complaint that Mapco had already achieved a 100% monopoly at that time. They then sought injunctive relief. As already noted, appellants later argued that high prices had ensued as the natural result. Similarly, at oral argument below in the instant case, appellants recognized that underpricing and overpricing are inextricable aspects of one actionable anticompetitive act:

> and that's the basis of our complaint, the exploitation of the monopoly which, you know, why have predatory pricing if you aren't gonna exploit it later.

By accepting the settlement agreement, however, appellants waived this claim. In so doing, they presumably agreed to accept

Mapco's existent monopoly position and the existent contracts by means of which they allegedly achieved their monopoly.

■ In summary, we discern only one actionable claim or transactional event in this case, which claim was already settled in *76 Aviation*. As a matter of law, a valid release will bar any subsequent claims covered by the release.[11] *Mitchell v. Mitchell*, 655 P.2d 748, 751 (Alaska 1982). "A policy favoring termination of litigation and encouraging settlement agreements should prevail." *Id.*

In light of the release in *76 Aviation*, aspects of the alleged monopolistic activity up to the date of the release are not actionable. Consequently, appellants' present claim is limited to events subsequent to the date of the release. We do not consider that alleged overpricing, by itself, constitutes an "event" giving rise to a new cause of action.

■ This is not to say that appellants are forever barred from bringing a future antitrust claim against Mapco. There is no dispute that a new cause of action accrues for damages caused by post-settlement antitrust conduct each time such new or renewed conduct is engaged in. *Lawlor v. National Screen Service Corp.*, 349 U.S. 322, 327–328, 75 S.Ct. 865, 868, 99 L.Ed. 1122 (1955); *Cf. Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 669 F.2d 490, 494 (7th Cir.1982).

Finally, appellants suggest that even if the alleged overpricing involves future damage from pre-release conduct, the damage was too speculative to be recoverable at the time of *76 Aviation*. Therefore, they argue that no cause of action had yet accrued and the release should not bar assertion of the post-release damages now.

We find *Marketing Assistance Plan, Inc. v. Associated Milk Producers, Inc.*, 338 F.Supp. 1019 (S.D.Texas 1972) useful for its comprehensive statements regarding the effect of a release upon recovery for post-release damages.

*Marketing Assistance* involved an antitrust action by one milk cooperative association against its competitor milk cooperative. The defendant motioned for summary judgment on the basis of a settlement release from the plaintiff; the release had terminated a prior action between the parties and an order had been entered upon the settlement dismissing the complaint with prejudice.

The Texas District Court discussed the situation as follows:

The *release bars* MAP, the other plaintiffs, and any producers who might later join MAP, from subsequently prosecuting that cause of action, or *any cause of action, which arose out of the facts giving rise to the dispute* in 68–H–930.

. . . . .

The release bars suits for activities engaged-in and damages consummated before the release. *Damages arising from pre-release activity, but which were not consummated until after the release, are also included within the ambit of the release* since the plaintiffs had a cause of action for all provable damages that would flow in the future from the defendant's conduct. *Zenith Radio Corp., supra* [401 U.S. 321 at 338], 91 S.Ct. 795 [at 806], 28 L.Ed.2d [77] at 92. No one would reasonably expect the consequences of pre-release conduct to cease as of the day of the release, and *such damages must certainly have been contemplated by the parties. Indeed the plaintiffs sought to enjoin* the continuation of the alleged monopolistic activities for which they sought damages under the antitrust laws. *The release of all claims, demands, rights, or causes of action arising out of the subject matter involved in the first suit, except those expressly excluded, included the compromise of the then recoverable post-release damages*

---

11. Appellee alternatively argues that the doctrine of *res judicata* bars the claim in this case. Since we find the release dispositive of the issue, it is unnecessary to consider the preclusive effect of *res judicata*.

*for the pre-release conduct of the de-fendants. The release does not bar* recovery here of post-release damages which were *too speculative* to be recovered at the time of the release, for no cause of action had accrued for such damages. *Id.* [401 U.S. 321 at 338–340] 91 S.Ct. 795 [at 806–807] 28 L.Ed.2d at 92–93.

.   .   .   .   .

To summarize, the Court is of the opinion that the release ... bars the assertion ... of claims for pre-release damages, and of claims for post-release damages which were the consequences of pre-release activities which could have been recovered in that civil action. The release does not bar post-release consequential damages which were too speculative to be recoverable in the earlier action....

The release *does not bar* the assertion by any of the parties in these categories of any *post-release causes* of actions for damages caused *by renewed monopolistic activities* by the defendants in either the first action or this action.

*Id.*, 338 F.Supp. at 1022–1023 (emphasis added).

Accordingly, we find that the settlement release in *76 Aviation* encompassed all claims reasonably ascertainable at the date of its execution. Damages from prospective price increases were among those compromised. They were not so highly speculative at the time of the release to warrant a separate cause of action now. Indeed, appellants were keenly aware that higher prices were among the consequences of the pre-release conduct complained of in *76 Aviation*.

Our decision does not give license to Mapco to engage in future unlawful activity. On the contrary, appellants themselves are not barred from bringing a future claim on the basis of actionable conduct occurring subsequent to the release date. In light of the previous release by the appellants, appellants are minimally required to base their claims on some new factors or additional circumstances which

are evocative of anticompetitive conduct. This they have failed to do.

We affirm the trial court's order granting summary judgment to Mapco.

AFFIRMED.