*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| RONALD P. ALLEVA, a/k/a RON ALLEVA; ANNETTE M. ALLEVA; ALLEVA INVESTMENTS, LLC; and GRUBSTAKE AUCTION COMPANY, INC., | ) ) ) ) ) ) | Supreme Court No. S-17302 |
| | ) | Superior Court No. 3AN-18-06322 CI |
| | ) ) | O P I N I O N |
| Appellants, | ) ) | No. 7472 – July 24, 2020 |
| v. | ) ) | |
| THE MUNICIPALITY OF ANCHORAGE; HERITAGE LAND BANK; CATHOLIC SOCIAL SERVICES, INC.; and BEAN'S CAFÉ, INC., | ) ) ) ) ) ) ) | |
| Appellees. | ) ) ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Jennifer Henderson, Judge.

Appearances: Paul J. Nangle, Paul J. Nangle & Associates, Anchorage, for Appellants. Pamela D. Weiss, Assistant Municipal Attorney, and Rebecca A. Windt Pearson, Municipal Attorney, Anchorage, for Appellees Municipality of Anchorage and Heritage Land Bank. Kimberlee A. Colbo, Hughes White Colbo Wilcox & Tervooren, LLC, Anchorage, for Appellee Catholic Social Services, Inc. Andrew J. Fierro, Law Office of Andrew J. Fierro, Inc., Anchorage, for Appellee Bean's Café, Inc.

Before:  Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

MAASSEN, Justice.

## I.    INTRODUCTION

Landowners settled a lawsuit against a municipality and organizations that operate a homeless shelter and a soup kitchen; the settlement agreement recited that the landowners accepted a sum of money in exchange for a release of present and future trespass and nuisance claims involving the organizations' clients.  Six years later the landowners filed this lawsuit asserting similar claims.  Their complaint referred to the prior settlement, but they did not file the settlement agreement with the complaint.  The defendants moved to dismiss, relying on the settlement agreement.

The landowners argued that because the settlement agreement had not been filed with the complaint, it could not be used as a basis for dismissal under Alaska Civil Rule 12(b)(6).  The superior court rejected the landowners' argument, granted the motion to dismiss, and ruled in the alternative that the defendants were entitled to summary judgment.  The landowners appealed.

We agree with the superior court that the settlement agreement was properly considered on the motion to dismiss because it was addressed in the complaint and its authenticity was not questioned.  We also agree that the settlement bars the landowners' current lawsuit.  We therefore affirm the judgment of the superior court.

## II.    FACTS AND PROCEEDINGS

Ronald and Annette Alleva own property in downtown Anchorage.  They rent portions of their property to commercial tenants and use some of the property for their own business purposes.  The Allevas and two of their businesses, Grubstake Auction Company, Inc., and Alleva Investments, LLC, are plaintiffs in this case.  Their

property is located near Bean's Café, a charitable soup kitchen, and the Brother Francis Shelter, a homeless shelter operated by Catholic Social Services, LLC. These service providers lease land from the Heritage Land Bank, a division of the Municipality of Anchorage.[1]

### 1. The 2012 lawsuit and settlement

In 2012 Ronald Alleva filed a lawsuit against the Municipality, Catholic Social Services, and Bean's Café. He alleged trespass and nuisance claims and sought both injunctive and monetary relief. He alleged that his health, safety, property values, and ability to enjoy his property suffered because of his neighbors' "inability and failure to control the illegal activities of their clients." He alleged that these illegal activities included "assault and battery, the use and sale of drugs and alcohol, littering, the discharge of urine, fecal material, snot and vomit, public copulation, camping, misconduct with firearms and other weapons, and gang related activities." He also alleged that the illegal activities had prompted over 800 calls per year for emergency services, and that the Municipality had wrongfully failed to charge Catholic Social Services and Bean's Café for the excessive number of calls.[2]

The 2012 lawsuit ended with a settlement agreement signed by both Ronald and Annette Alleva and their business, Grubstake Auction Company. In exchange for $30,000, the Allevas agreed that they

> release and forever discharge **Catholic Social Services, Inc., Beans'** [sic] **Café Inc. and the Municipality of Anchorage**, their successors and assigns, . . . and all other persons, firms, . . . [and] corporations . . . liable or who might be claimed to be liable, . . . of and from all actions, causes of

---

[1]    *See* Anchorage Municipal Code 25.40.010 (1995).

[2]    *See* AMC 08.80.020 (2009) (imposing fees for "excessive police response to the dwelling unit or commercial unit during a calendar year").

> action, suits, controversies, claims, damages, and demands of every kind and nature, asserted or unasserted, mature or to mature in the future and for and by reason of any matter, thing or claim and especially from all claims, demands, injuries, damages and complaints accrued or hereafter to accrue, concerning [the Allevas'] use, ownership and occupancy of [their] properties. [Emphasis in original.]

The agreement stated that the Allevas "unequivocally release [the Municipality, Catholic Social Services, and Bean's Café] from any and all claims (legal, equitable, administrative or otherwise) including but not limited to damages and claims in any way related to the above described residential and commercial real property" or related to the parties' use of their properties. Most important here, the agreement stipulated that the Allevas "further waive, release and discharge *any future claims* arising out of or relating to the conduct of guests or invitees of the [Municipality, Catholic Social Services, and Bean's Café] *including without limitation any claim based on trespass or other damage to the above described property*." (Emphasis added.)

### 2. The 2018 lawsuit

In April 2018 Ronald and Annette Alleva, Grubstake Auction Company, and Alleva Investments (the Allevas) filed a complaint against the Municipality, the Heritage Land Bank, Catholic Social Services, and Bean's Café. As in the 2012 complaint, the Allevas alleged trespass and nuisance claims and sought injunctive and monetary relief. Although the 2018 complaint added an inverse condemnation claim, it included allegations of harm taken verbatim from the 2012 complaint. For example, both complaints alleged that the "illegal activities" of the clients of Bean's Café and Catholic Social Services created "numerous health risks," decreased property values, and "severely and negatively impacted" the Allevas' ability to use and enjoy their property. Both complaints alleged that the charities' clients engaged in "numerous illegal activities" on the Allevas' property "including but not limited to assault and battery, the

use and sale of drugs and alcohol, littering, the discharge of urine, fecal material, snot and vomit, (indeed myriad bodily fluids), public copulation, camping, misconduct with firearms and other weapons, and gang related activities." (The parenthetical in the quoted language was not in the 2012 complaint; the rest of the language was the same in both.) The 2018 complaint mirrored the 2012 complaint by alleging, in nearly identical terms, that "[t]he illegal activities of [the clients] have created numerous health risks for plaintiffs and his [sic] tenants and guests," and the Allevas again asserted that the Municipality wrongfully failed to charge Catholic Social Services and Bean's Café for excessive emergency service calls necessitated by their clients' conduct.

The 2012 settlement agreement was not attached to the 2018 complaint, but the complaint did make reference to it: "Plaintiff Ronald P. Alleva has previously filed a lawsuit against these same defendants regarding similar illegal acts and harmful behaviors, under case number *3AN-12-08260 CI*. That lawsuit was settled on mutually agreeable terms." The Allevas asserted, however, that the new lawsuit concerned only "those acts and behaviors that have taken place since the date of that settlement of that prior lawsuit, and exclude all acts from before the date of that prior settlement" and was therefore not barred by the agreement.

The Municipality moved to dismiss the 2018 lawsuit pursuant to Alaska Civil Rule 12(b)(6), attaching a copy of the 2012 settlement agreement and arguing that it barred the Allevas' current claims. Catholic Social Services joined the motion, and Bean's Café did not oppose it. The Allevas opposed the motion, but they did not submit affidavits or other evidence; they argued only that their new complaint was not barred by the 2012 settlement agreement because the new complaint involved only conduct that post-dated the agreement.

The superior court asked about the settlement agreement during oral argument on the Municipality's motion to dismiss. The court asked whether there was any dispute about "what's been set forth as the release [agreement]," and the Allevas' counsel responded, "No, Your Honor. . . . It is the release." The Allevas argued, however, that the Municipality's reliance on the settlement agreement required the court to convert the Rule 12(b)(6) motion into one for summary judgment and to allow discovery before ruling.

The court granted the Municipality's motion to dismiss. Applying Alaska and federal precedent, the court decided that it could consider the 2012 settlement agreement when ruling on the motion to dismiss because "[t]he complaint clearly references the settlement agreement," and "when specifically asked at oral argument, [the Allevas] acknowledged that the settlement agreement was authentic." The court found that the agreement's "language is clear on its face" and that it "unambiguously bars [the Allevas'] claims." The court decided in the alternative that the motion to dismiss could be converted to a summary judgment motion and granted for the same reason. The Allevas appeal.

## III.   STANDARD OF REVIEW

We review grants of motions to dismiss de novo.[3] "In conducting de novo review, we will 'adopt the rule of law that is most persuasive in light of precedent, reason, and policy.' "[4] "In reviewing a motion to dismiss, we generally do not consider

---

[3]     *Pedersen v. Blythe*, 292 P.3d 182, 184 (Alaska 2012).

[4]     *Haight v. City & Borough of Juneau*, 448 P.3d 254, 256 (Alaska 2019) (quoting *State, Div. of Elections v. Green Party of Alaska*, 118 P.3d 1054, 1059 (Alaska 2005)).

matters outside the complaint, although we may consider attachments to the complaint."[5]

## IV. DISCUSSION

### A. The Superior Court Did Not Err By Deciding That The Settlement Agreement Was Within The Pleadings For Purposes Of A Motion To Dismiss Even Though It Had Not Been Attached To The Complaint.

An Alaska Civil Rule 12(b)(6) motion to dismiss is "grounded on the 'failure to state a claim upon which relief can be granted.' Such a motion tests the legal sufficiency of the complaint's allegations."[6] "Civil Rule 12(b) provides that if a Rule 12(b)(6) motion . . . involves presentation to the court of matters outside the pleadings, and if these outside matters are not excluded by the court, then the motion must be treated as one for summary judgment under Civil Rule 56."[7]

The Allevas argue that because they did not attach the settlement agreement to their complaint, it was "outside the pleadings" and should not have been considered on the motion to dismiss. They assert that while there are exceptions that allow a court to consider evidence outside the pleadings — such as documents subject to strict judicial

---

[5] *Larson v. State, Dep't of Corr.*, 284 P.3d 1, 7 (Alaska 2012) (citation omitted).

[6] *Dworkin v. First Nat'l Bank of Fairbanks*, 444 P.2d 777, 779 (Alaska 1968) (quoting Alaska R. Civ. P. 12(b)(6)).

[7] *Brice v. State, Div. of Forest, Land & Water Mgmt.*, 669 P.2d 1311, 1314 (Alaska 1983); *Larson*, 284 P.3d at 7.

notice[8] or in the public record[9] — neither exception applies in this case.

The Municipality counters that because the complaint referred to the settlement agreement explicitly and the Allevas admitted its authenticity, it should be viewed as being within the pleadings for purposes of a motion to dismiss. The Municipality argues that adopting the Allevas' position would "create the perverse incentive" for parties to avoid attaching relevant documents to their complaints in order to forestall dismissal.

We addressed the materials that could be considered on a motion to dismiss in *Ahwinona v. State*, which, like this case, involved a lawsuit following an earlier settlement agreement between the same parties.[10] Ahwinona was injured while in State custody and signed a "Release of All Claims" in exchange for a sum of money.[11] Three years later he sued two of the original parties for personal injury, attaching the release and several other documents to the complaint.[12] The superior court granted a motion to dismiss without stating which, if any, of the attachments it relied on to reach its

---

[8]     *See Pedersen*, 292 P.3d at 185 (noting that when deciding motion to dismiss, court must give notice of intent to take judicial notice of evidence outside pleadings and afford opposing party "an opportunity to dispute the facts judicially noticed" (quoting *Schwartz v. Commonwealth Land Title Ins. Co.*, 374 F. Supp. 564, 579 (E.D. Pa. 1974))).

[9]     *See Nizinski v. Currington*, 517 P.2d 754, 756 (Alaska 1974) (affirming that superior court properly considered matters of public record — affidavits from related lawsuit — on motion to dismiss).

[10]     922 P.2d 884, 884 (Alaska 1996).

[11]     *Id.* at 884-85.

[12]     *Id.* at 885.

decision.[13] We affirmed the court's judgment on appeal.[14] Citing a substantial body of federal authority, we held that "the trial court could properly rely upon these materials [attached to the complaint] in deciding the State's motion to dismiss under Rule 12(b)(6) without converting it into a motion for summary judgment under Rule 56."[15]

In *Ahwinona* we did not address the issue presented here: whether the court errs by considering documents referenced in the complaint, but not submitted with it, without first converting a motion to dismiss into a motion for summary judgment. But some of the federal authorities on which we relied in *Ahwinona* do address this issue. Interpreting Rule 12(b)(6) of the Federal Rules of Civil Procedure, Professors Wright and Miller explain that "[t]he court is not limited to the four corners of the complaint" and that "[n]umerous cases . . . have allowed consideration of matters incorporated by reference or integral to the claim" as well as, among other things, "exhibits attached to the complaint whose authenticity is unquestioned."[16] The Ninth Circuit Court of Appeals

---

[13]     *Id.* at 885-86.

[14]     *Id.* at 888.

[15]     *Id.* at 886. Justice Rabinowitz concurred in the judgment but disagreed with the court's application of the Rule 12(b)(6) standard to Ahwinona because he was "unrepresented at all times in connection with the proceedings in the superior court." *Id.* at 888. In their briefing, the Allevas allege that Ronald was pro se in 2012. But the Allevas have been represented from the beginning of this case, and there is no reason to relax the rules governing procedure in the trial court.

[16]     5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357 (3d ed. 2004).

adopted this rule in *Branch v. Tunnell*,[17] also cited in *Ahwinona*.[18] The court had earlier concluded "that a document is not 'outside' the complaint if the complaint specifically refers to the document and if its authenticity is not questioned."[19] Citing the "leading commentators" — Professors Wright and Miller — the court explained that "when [the] plaintiff fails to introduce a pertinent document as part of his pleading, [the] defendant may introduce the exhibit as part of his motion attacking the pleading."[20] The court concluded, "As [this rule] makes sense and comports with existing practice, we hold that documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss" without converting the motion into one for summary judgment.[21] The *Branch* court affirmed a dismissal that relied in part on a deposition and an affidavit of unquestioned authenticity that were "expressly mentioned in the amended complaint."[22]

Our case law makes clear that "motions to dismiss are disfavored"[23] and should be granted only if "it appears beyond doubt that the plaintiff can prove no set of

---

[17]   14 F.3d 449 (9th Cir. 1994), *overruled on other grounds by Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

[18]   922 P.2d at 886 (Rabinowitz, J., concurring).

[19]   *Branch*, 14 F.3d at 453 (citing *Townsend v. Columbia Operations*, 667 F.2d 844, 848-49 (9th Cir. 1982)).

[20]   *Id.* (alterations in original) (quoting 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1327 (2d ed. 1990)).

[21]   *Id.* at 454.

[22]   *Id.*

[23]   *Adkins v. Stansel*, 204 P.3d 1031, 1033 (Alaska 2009).

facts that would entitle him or her to relief."[24] This restraint, however, must be exercised in light of Rule 12's goal of promoting the efficient resolution of cases that can be decided early and without great expense to either side.[25] Having weighed these considerations, we adopt the rule as stated by the Ninth Circuit in *Branch*: "[D]ocuments whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss" without converting the motion to one for summary judgment.[26] Here, because the 2018 complaint specifically referred to the 2012 settlement agreement and the Allevas conceded the agreement's authenticity, the superior court did not err by considering it on the Municipality's motion to dismiss.

### B.     The 2012 Settlement Agreement Bars The Allevas' Complaint.

We next review the superior court's conclusion that the 2012 settlement agreement bars the Allevas' current lawsuit. "As a matter of law, a valid release will bar any subsequent claims covered by the release. 'A policy favoring termination of litigation and encouraging settlement agreements should prevail.' "[27]

---

[24]     *Id.* (quoting *Catholic Bishop of N. Alaska v. Does 1-6*, 141 P.3d 719, 722 (Alaska 2006)).

[25]     *See* 5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1342 (3d ed. 2004) (stating "the basic philosophy of Rule 12" as preventing both sides from putting "the other to such expense and delay as to make the seeking of justice a profitless thing, all the more so when such expense and delay is the sole benefit accomplished" (quoting *E. I. Du Pont De Nemours & Co. v. Dupont Textile Mills, Inc.*, 26 F. Supp. 236, 236-37 (M.D. Pa. 1939))).

[26]     *Branch*, 14 F.3d at 454.

[27]     *Petroleum Sales, Ltd. v. Mapco Alaska, Inc.*, 687 P.2d 923, 929 (Alaska 1984) (footnote omitted) (citation omitted) (quoting *Mitchell v. Mitchell*, 655 P.2d 748, 751 (Alaska 1982)).

The Allevas argue that the 2012 agreement does not preclude their current lawsuit because their complaint alleges only conduct and injuries arising after the agreement was signed, and agreements releasing liability for future conduct are disfavored. They also argue that waivers of future claims should be enforced only when they are clear and unambiguous, and the language of the settlement agreement — specifically the phrase "future claims" — is ambiguous. They argue that "future claims" could mean either future claims that arise "because the past conduct of the released party results in new damages manifesting themselves" or future claims that arise "based upon conduct of the released party that has not even occurred as of the date of the signing of the release agreement."

In response, the Municipality argues that the settlement agreement's language unambiguously "bars [the Allevas] from bringing claims arising out of the very same conduct alleged in the 2012 Complaint." The Municipality highlights the 2018 complaint's language alleging ongoing harms, including "continued problems," "continu[ed] trespasses," and descriptions of how Bean's Café and Catholic Social Services "continue[] to occupy and use" their property. The Municipality points to similar allegations in both complaints, including that Bean's Café and Catholic Social Services failed to mitigate their clients' negative impacts and that the Municipality failed to charge the two organizations for excessive emergency service calls. The Municipality and Catholic Social Services assert that Alaska law strongly favors settlement agreements and that, absent a successful motion to set the agreement aside, the superior court was obliged to enforce it.

The parties' arguments highlight the potential tension between two goals:

on the one hand, protecting the right to seek a remedy for new and unanticipated harm,[28] and, on the other hand, enforcing a valid arm's-length agreement to give up that right.[29] A leading treatise summarizes how courts have addressed this tension:

> Contract provisions releasing or limiting liability for claims that have not yet arisen are generally not favored, in contrast to contracts to settle existing claims, which are favored as a means of avoiding litigation and settling or compromising disputes amicably. However, a contract for the future discharge of a claim will be upheld according to its terms unless it purports to immunize future conduct that is either intentionally tortious or grossly negligent, or unless it otherwise violates a strong, well articulated, and clear public policy. Also, even then, an agreement will be upheld if the conduct that might result from and be insulated by the clause is not seriously immoral and the agreement does not by its terms or in practical effect induce such inappropriate conduct.
>
> Generally, clauses limiting future liability are strictly construed by the courts and are unenforceable unless assented to in a context of free and understanding negotiation.[30]

In short, settlement agreements that waive future liability will be upheld subject to certain limits, and in any event they will be strictly construed.

We have addressed releases of future liability before. In *Petroleum Sales, Ltd. v. Mapco Alaska, Inc.*, a lawsuit that followed settlement of an earlier case, we were

---

[28]    *See id.* ("There is no dispute that a new cause of action accrues for damages caused by post-settlement . . . conduct each time such new or renewed conduct is engaged in.").

[29]    *See Kazan v. Dough Boys, Inc.*, 201 P.3d 508, 524-25 (Alaska 2009) (explaining judicial policy favoring enforcement of private settlement agreements as negotiated by the parties).

[30]    8 WILLISTON ON CONTRACTS § 19:21, at 356-65 (4th ed. 2010) (footnotes omitted).

"required to determine whether appellants presently allege unlawful acts sufficiently dissimilar from those encompassed in the previous settlement release which give rise to a new actionable claim."[31] The case began in 1979, when Mapco's predecessor-in-interest was sued for alleged monopolization of a regional refined oil market.[32] That case settled, and each side "expressly released the other 'from any and all claims, equitable and legal, known or unknown, which they presently have . . . and each covenant[ed] not to sue [the other] based on any such claims existing as of'' the settlement date.[33] Two years later, two of the parties to the settlement again sued Mapco alleging violations of the same statutes; "[t]he only new conduct complained of subsequent to the release [was] price increases in alleged exploitation of the monopolistic position already obtained."[34]

We concluded that the "complaint in [that] case substantially echoe[d]" the prior complaint and was barred by the settlement.[35] Under the settlement's terms, "aspects of the alleged monopolistic activity up to the date of the release [were] not actionable."[36] Although there was "no dispute that a new cause of action accrues for damages caused by post-settlement antitrust conduct each time such new or renewed conduct is engaged in," the allegations stemming from the alleged monopoly were not

---

[31] 687 P.2d at 924.

[32] *Id.* at 925-26.

[33] *Id.* at 926 (first and third alterations in original).

[34] *Id.* at 928.

[35] *Id.* at 928-29.

[36] *Id.* at 929.

new events "giving rise to a new cause of action."[37] We determined that the agreement covered claims that were "reasonably ascertainable" when the agreement was signed.[38] Under this standard, "[d]amages from prospective price increases were among those compromised. They were not so highly speculative at the time of the release to warrant a separate cause of action now. Indeed, appellants were keenly aware that higher prices were among the consequences of the pre-release conduct" in the prior lawsuit and were therefore barred from bringing new litigation.[39]

In *Martech Construction Co., Inc. v. Ogden Environmental Services, Inc.,* we applied *Mapco*'s "reasonably ascertainable" standard to a settlement agreement that released liability "against any 'claims of any nature whatsoever' between" a construction contractor and subcontractor.[40] In the second suit the parties disputed who was required to pay for a switchgear that had been ordered but not yet paid for or delivered when they signed their settlement agreement.[41] We held that the switchgear claim was reasonably ascertainable at the time of the settlement agreement and, because the broad language of the agreement "indicate[d] a complete washing of the hands between the parties," the agreement precluded the claim.[42]

Following *Mapco*, the first question before us is whether it was reasonably ascertainable that the objectionable conduct of the defendants' clients would continue

---

[37] *Id.*

[38] *Id.* at 930.

[39] *Id.*

[40] 852 P.2d 1146, 1151-52 (Alaska 1993).

[41] *Id.* at 1150.

[42] *Id.* at 1152.

following the 2012 settlement agreement. We note that the agreement itself contains no representations by the defendants that any of that conduct would cease, or that they would make efforts to curb it, or indeed that the relationship between the parties would change in any way. And the 2018 complaint alleges that the objectionable conduct did continue; both complaints allege the same conduct and the same resulting harm, often in exactly the same words. The Allevas submitted no affidavits or other evidence suggesting that the objectionable conduct had changed in any material way or that some new kind of conduct occurred that the parties had not reasonably anticipated.

Under the settlement agreement, the Allevas agreed to tolerate the ongoing problems with their neighbors in exchange for a sum of money. They explicitly released the defendants "from any and all claims . . . in any way related to the [Allevas'] real property . . . and/or the [defendants'] use of their adjoining properties," including "*any future claims* arising out of or relating to the conduct of guests or invitees of the [defendants] including without limitation any claim based on trespass or other damage to the [Allevas'] property." (Emphasis added.) Even strictly construed, this language covers the claims in the Allevas' complaint. Their claims arise out of, and are wholly related to, the actions of Bean's Café's and Catholic Social Services' clients and the impact of those actions on the Allevas' properties.[43] The settlement agreement uses broad and inclusive language, but it is clear about the nature of claims being released; as in *Martech*, it appears to have been intended as "a complete washing of the hands" between the parties.

The question remains whether the parties' agreement should be enforced according to its terms. This case does not implicate the concerns highlighted in *Williston* that "clauses limiting future liability" be "assented to in a context of free and

---

[43] The 2018 complaint added an inverse condemnation claim to the ones alleged in 2012, but the factual basis of it is the same, and the Allevas do not argue that it should have been viewed any differently than their claims for nuisance and trespass.

understanding negotiation";[44] the Allevas admitted in their complaint that the 2012 settlement was "on mutually agreeable terms." We also consider whether allowing the parties' agreement to stand would violate "a strong, well articulated, and clear public policy"[45] and conclude that it would not. Public policy supports the "enforcement of settlement agreements," both out of respect for parties' freedom to contract and to "reduce demand for judicial resources."[46] This case involves trespass and nuisance claims between neighbors; it does not involve claims for "intentionally tortious or grossly negligent" conduct[47] or otherwise implicate a serious public policy concern that would outweigh the parties' contractual intent.

Because we affirm the superior court's dismissal under Civil Rule 12(b)(6), we need not reach its decision in the alternative to grant summary judgment under Civil Rule 56.

## V.    CONCLUSION

The superior court's judgment is AFFIRMED.

---

[44]    8 WILLISTON ON CONTRACTS § 19:21, at 365 (4th ed. 2010).

[45]    *Id.* at 363.

[46]    *Kazan v. Dough Boys, Inc.*, 201 P.3d 508, 524-25 (Alaska 2009).

[47]    *See* 8 WILLISTON ON CONTRACTS § 19:21, at 363; *Wassink v. Wassink*, 763 P.2d 971, 975 (Alaska 1988) ("Normally agreements between private parties are upheld and enforced by courts. However, authorities hold that an agreement exempting a party from liability for future willful or negligent conduct should not be enforced where the interest of the public is involved.").